[Cite as *State v. Pullen-Morrow*, 2012-Ohio-3605.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO              :

                                 :       Appellate Case No. 24862

        Plaintiff-Appellee       :

                                   :       Trial Court No. 2010-CR-3687/2

v.                               :

                                   :

SHAMARI PULLEN-MORROW     :       (Criminal Appeal from

                                   :        Common Pleas Court)

        Defendant-Appellant     :

                                   :

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of August, 2012.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JOHNNA M. SHIA, Atty. Reg. #0067685, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

MICHAEL C. THOMPSON, Atty. Reg. #0041420, Wright-Dunbar Business Village, 5 North Williams Street, Dayton, Ohio 45402-2843
       Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Shamari Pullen-Morrow appeals from the

revocation of community control sanctions, and the imposition of an eighteen-month sentence for Complicity to Commit Robbery. Pullen-Morrow contends that her counsel at the revocation hearing was ineffective for having failed to object to testimony from a probation officer having no first-hand knowledge of the contents of a "discharge summary" from the MonDay Program, and to the admission of that document as an exhibit.

{¶ 2} We conclude that counsel was not ineffective for having failed to object. The discharge summary reflected unequivocally that Pullen-Morrow was unsuccessfully discharged from the MonDay Program. Counsel used the second-hand nature of the proof in an attempt to persuade the trial court that the State had failed in its burden of proof. Counsel also used positive facts in the discharge summary in an attempt to persuade the trial court that Pullen-Morrow was still amenable to community control sanctions. This was a reasonable hearing strategy.

{¶ 3} Furthermore, Pullen-Morrow cannot demonstrate, from this record, that the result of the proceeding would likely have been different had trial counsel interposed objections. Had Pullen-Morrow objected, and had her objections been sustained, the State would likely have requested a continuance to bring an employee of the MonDay Program into court to testify who would have first-hand knowledge of Pullen-Morrow's discharge from the program, and the reasons therefor. The trial court may well have exercised its discretion to allow the continuance, resulting in better evidence of Pullen-Morrow's unsuccessful discharge from the program, and her lack of amenability to community control sanctions. Therefore, we cannot find, from this record, that the result of the proceeding would likely have been different had her counsel objected to the evidence.

{¶ 4}    The judgment of the trial court is Affirmed.

## I.    The Course of Proceedings

{¶ 5}    In January, 2011, Pullen-Morrow pled guilty to one count of Complicity to Commit Robbery, a felony of the third degree.   She was sentenced to community control sanctions for a period of time not to exceed five years.

{¶ 6}    In June, 2011, after a status conference, the trial court modified the community control sanctions to include: "A requirement that the defendant successfully complete the MonDay Program as well as any aftercare recommended."

{¶ 7}    In September, 2011, Pullen-Morrow was served with a Notice of CCS Revocation Hearing and Order, in which she was ordered to appear at a hearing and admit or deny that, after having been ordered to successfully complete the MonDay Program, "you were unsuccessfully discharged (clinical) on September 13, 2011."

{¶ 8}    At the revocation hearing, the State called Linda Toops, an intensive probation officer employed by the Montgomery County Adult Probation Department.   Toops was familiar with the Monday Program.   She described it as follows:

A.   The MonDay Program is a correctional program designed to house both male and females for a period of up to six months.

Q.   Okay.   Is – do you – do people who go there get treatment, do they get schooling?   What kinds of things does the MonDay Program do for a person?

A.   The program can be very helpful for the people who need to complete certain things such as their GED.   It helps with behavioral modification, although they have – the

program itself has undergone some changes here recently. It may not be classified exactly as a behavioral modification program any longer. But they are there to assist with those types of things, in addition to drug and alcohol issues, and other things as well.

{¶ 9} Toops acknowledged that her knowledge of the MonDay Program was limited:

Q. Can you give me a little bit more information about the MonDay Program itself? Is it divided into phases?

A. It is.

Q. Can you tell me about those phases briefly?

A. I cannot. Actually, I'm not a MonDay expert. I'm not a staff member of the MonDay Program, so I don't feel I'm qualified to describe thoroughly their phases.

Q. Okay. How did – do you know how one progresses through the MonDay Program?

A. Well, I would really rather not speak on that either. Like I said, I'm an intensive probation officer. I don't work for the MonDay Program.

{¶ 10} Pullen-Morrow's discharge summary from the MonDay Program was marked as an exhibit. The State handed Toops the exhibit and told her that "it appears to come from the MonDay Program from Jennifer Scott." To this, Toops responded "Um-hum." Her direct examination continued as follows:

Q. And what do you recognize that to be?

A. This appears to be her discharge summary.

Q. Okay. And can you tell us why the MonDay staff says that she was discharged?

A. Give me one moment, please.

Q.  Okay.

A.  If that's okay.

Q.  Sure.

A.  Well, it's a rather lengthy paragraph.   It kind of summarizes some of the reasons why she was discharged.   Would you like for me to read part of it or –

Q.  Sure.

A.  Okay.   It says, "Ms. Pullen-Morrow entered MonDay on June 16, 2011, and was clinically unsuccessfully discharged on September 13, 2011, staying a total of 90 days.   This was a clinical discharge due to Ms. Pullen-Morrow's lack of motivation and noncompliance with the rules and programming."

Q.  Okay.   So, they list lack of motivation and lack of compliance with rules and programming; is that –

A.  Yes, that's correct.

**{¶ 11}**  On cross-examination, Toops was asked: "So, the MonDay Program basically submitted this report and you go off the report itself," to which she responded, "That's correct."

**{¶ 12}**  Toops did testify on cross-examination concerning one conversation she had with Pullen-Morrow after Pullen-Morrow's discharge from the MonDay Program:

Q.  Did you have a chance at any – at any time, and please be specific when you answer the question, of talking to Shamari [Pullen-Morrow] about her MonDay Program interactions at all?

A.  I did.

Q.  Okay.   When was the first time you did that?

A.   Once she was discharged from the program and a jail visit was conducted with Ms. Pullen.

Q.   Do you recall what month that was?

A.   It would have been after her discharge, so, she was discharged on September 19th.

Q.   Okay.   And what – what kind of conversation did you have with Ms. Pullen?

A.   I'm sorry.   She was discharged on September 13th, so it was shortly thereafter.

We had a conversation at the Montgomery County Jail as to, you know, why she got kicked out of the program.

Q.   Was she upset?   Wasn't she upset that she was kicked out?

A.   I wouldn't say she was upset that she got kicked out.

Q.   All right.

A.   She was upset, I think, at the fear of possibly going to prison for five years.

Q.   And so, she went into the MonDay Program June 16, 2011, was unsuccessfully discharged on September 13, 2011, so she spent about 90 days in there?

A.   Yes.

Q.    While she was in there, do you have any knowledge of the things she had accomplished in the MonDay Program?

A.   Just what would be in the – listed in the MonDay report.   It was my understanding she made very little progress and, in fact, she never really got beyond what's called the orientation phase.

Q.   Did you discuss with her any of her accomplishments other than what's listed in the report?

A.   We had a brief conversation about some of the assignments that she stated that she did complete while she was in there.

Q.   Do you recall any of those?

A.   No, not specifics.

Q.   Okay.   So, if I mentioned something like she was working on her GED, and employment readiness class, do you have any idea what I'm talking about?

A.   She did indicate that she was working on her GED.

Q.   Okay.   What – does the employment readiness class ring a bell?

A.   No.

Q.   Okay.   Did she mention to you about how she wrote an autobiography as part of her treatment?

A.   No.   She did not mention that, no.

Q.   Did she mention that, according to Ms. Pullen, that there's community service options available in the MonDay Program that she took advantage of?

A.   I can't recall.   It seems like we did possibly discuss whether or not she had completed any community service in there, but I can't recall any specifics.

Q.   Do you re- – do you have any knowledge about whether Shamari interacted with staff well or not well?

A.   Just from what I've been told by the MonDay staff and from what Ms. Pullen shared with me.

Q.   What did Ms. Pullen share with you?

A.   She admitted that she was a mean girl at times, because the other mean girls in the

program rubbed off on her.

Q. But that was at times? That wasn't all the time?

A. That was her des- – her describing her own self. At times, she did display sort of an attitude towards various staff and she attributed that due to the other mean girls in the program rubbing off on her.

**{¶ 13}** Toops testified concerning the MonDay Program discharge summary without objection. The discharge summary was admitted in evidence without objection.

**{¶ 14}** At the conclusion of the hearing, the trial court indicated that Pullen-Morrow's unsuccessful discharge from the MonDay Program was the only rule violation the court would consider. (It was the only violation of which Pullen-Morrow had notice prior to the hearing.) The trial court did indicate that it would consider other evidence on the issue of Pullen-Morrow's continued amenability to community control sanctions. The trial court found that Pullen-Morrow had violated the terms of her community control sanctions, and that Pullen-Morrow was no longer amenable to community control. The trial court revoked community control, and sentenced Pullen-Morrow to eighteen months in prison.

**{¶ 15}** From the revocation of her community control sanctions and her sentence of imprisonment, Pullen-Morrow appeals.

## II. Trial Counsel's Failure to Object to the Testimony of Toops Concerning the MonDay Program Discharge Summary and to the Admission of the Discharge Summary in Evidence Does Not Constitute Ineffective Assistance of Counsel

**{¶ 16}** Pullen-Morrow's sole assignment of error is as follows: "APPELLANT'S

COUNSEL WAS INEFFECTIVE IN NOT OBJECTING TO A VIOLATION OF HER RIGHT TO CONFRONT AN ADVERSE WITNESS IN A COMMUNITY CONTROL REVOCATION HEARING; MOREOVER, THIS FAILURE CONSTITUTES PLAIN ERROR."

{¶ 17} A claim of ineffective assistance of trial counsel requires both a showing that trial counsel's representation fell below an objective standard of reasonableness, and that the defendant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, 466 U.S. 689. The prejudice prong requires a finding that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, with a reasonable probability being "a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. 694. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶ 18} Pullen-Morrow argues that because the admission of the evidence implicates her Sixth Amendment right to confront the witnesses against her, we would have to find the error harmless beyond reasonable doubt. But this would apply if the error had been preserved. It was not. Because the issue arises under a claim of plain error or ineffective assistance of counsel, the State need not show that the unpreserved error was harmless beyond reasonable doubt.

{¶ 19} In the case before us, the basis for the community control revocation was that Pullen-Morrow had not successfully completed the MonDay Program, which was required by

the terms of her community control sanctions. There was a report from the MonDay Program, in the form of Pullen-Morrow's discharge summary, that expressly stated that Pullen-Morrow had been discharged from the program for unsatisfactory performance. This was the hand dealt to Pullen-Morrow's trial counsel, and it was a difficult hand to play.

{¶ 20} Pullen-Morrow's trial counsel chose not to object to the second-hand nature of the evidence, consisting as it did of the testimony of Toops concerning the discharge summary. Instead, he argued that the evidence was too weak to support the necessary finding, and also used the report to establish some points in Pullen-Morrow's favor:

> Thank you, Your Honor. I think the State's failed to meet its burden today to revoke Shamari on these – on these issues. I think the MonDay Pro – having her clinician or somebody from the MonDay Program would have been more helpful to gain perspective on Shamari whether or not – or how she conducted herself during the program. For instance, Ms. Toops, not for lack of effort or work ethic, she just can't speak to how the MonDay Program treated Shamari or how she interacted with it. She wasn't sure Shamari could do community service during the MonDay Program. She may or may not have.

The employment issues states she tried to tie Shamari to what she didn't do in the past, instead of dealing with what's at hand, which is the MonDay Program itself. She did – or Ms. Toops testified that Shamari did turn in employment applications to her showing that she was trying to get a job. As weighs the court costs and fines, I'm sure it's not in the State's priority list for those to be paid, but there's case law out there that says if a defendant can't pay the court costs or fines, unable – because of – not of – not because of their own fault.

They're trying to get employment, et cetera. That's not to be considered.

Shamari, as stated in the report, did break numerous rules, but she did last 90 days. She's benefitting from it. She's making progress. For a young person – for her, prison's not amenable. It's not going to help her improve her life. And, obviously, as the Court can take note, there's family members that's been here for this hearing as well as other hearings, meaning that Shamari does have a good support system at home and would do better in a different kind of program other than in prison.

Thank you for hearing me, Your Honor.

{¶ 21} Had trial counsel objected to Toops testifying to the contents of the discharge summary, and to the admission of the discharge summary as an exhibit, and had those objections been sustained, it is likely that the State would have requested a continuance from the trial court so that it might present the author of the report, Jennifer Scott, as a witness. The trial court would have had discretion to grant a reasonable continuance, and most likely would have done so, rather than allow the revocation to fail by default, given that the discharge summary expressly states that Pullen-Morrow was unsuccessfully discharged from the program, for the reasons stated. The result would most likely have been stronger evidence for revocation.

{¶ 22} Parenthetically, we note that the testimony of Toops concerning her conversation with Pullen-Morrow arguably serves to prove, by Pullen-Morrow's admission, that Pullen-Morrow was discharged from the MonDay Program without having successfully completed it. Technically, that alone would have established a violation of one of the conditions of Pullen-Morrow's community control sanctions. But absent some proof of fault

on Pullen-Morrow's part, it is doubtful that she could have had her community control sanctions revoked. If, for example, Pullen-Morrow had been discharged from the program, without having successfully completed it, through no fault of her own, but because the MonDay Program had run out of funds, then it would seem to violate due process to revoke her community control sanctions for that reason alone. At most, the testimony of Toops concerning her conversation with Pullen-Morrow might be deemed to have established, by Pullen-Morrow's admission, that Pullen-Morrow was discharged from the MonDay Program without having completed it; that testimony falls short of establishing that Pullen-Morrow was at fault.

{¶ 23} Pullen-Morrow's trial counsel's strategy, at the hearing, seems to have been to argue that the testimony of Toops, due to its second-hand, hearsay nature, was insufficient to prove that she had violated a condition of her community control sanctions, or that it was insufficient to prove that she was no longer amenable to community control sanctions. We are not prepared to say that this was an unreasonable strategy under the circumstances.

{¶ 24} Furthermore, it does not seem so likely that the result of the proceeding would have been otherwise, had counsel interposed objections, as to undermine confidence in the outcome. As with other potential objections to the form of evidence, it seems likely that the State would just have presented better evidence to prove the violation. That better evidence existed, in the form of the testimony of Jennifer Scott, is not purely speculative; Scott's report – the discharge summary – demonstrates the likely nature of Scott's testimony, had she been called to testify.

{¶ 25} In her assignment of error, Pullen-Morrow contends that the admission of the

evidence constitutes plain error. Plain error requires a showing that the result of the proceeding would clearly have been otherwise but for the error. *State v. Cooperrider*, 4 Ohio St.3d 226, 227, 448 N.E.2d 452 (1983). *See also, State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), a case cited by Pullen-Morrow. For the reasons noted above, we cannot find that the result of Pullen-Morrow's revocation hearing would have been otherwise had the testimony of Toops been excluded.

{¶ 26} Pullen-Morrow cites *State v. Miller*, 42 Ohio St.2d 102, 326 N.E.2d 259 (1975) for the proposition that it is error, in probation revocation proceedings (the precursor to community control sanction revocation proceedings), to permit a probation officer who did not prepare entries in a probation department record to testify as to the contents of the record when the probation officer who prepared the entries in the record does not appear. The distinction is that in *Miller*, the probation officer's hearsay testimony was objected to. *Id.*, 42 Ohio St.2d 103.

{¶ 27} Pullen-Morrow cites a decision of this court, *State v. Houston*, 2d Dist. Champaign No. 06-CA-11, 2007-Ohio-868, ¶ 8, in which we said: "We agree with the Appellant that the trial court should not rely on hearsay evidence entirely in making the determination whether a probationer violated the terms of his probation." It is not clear whether the defendant in that case had objected to the admission of hearsay evidence at the revocation hearing. What is clear is that the appeal was not taken from the revocation of the defendant's community control sanctions; the appeal was taken from the sentences subsequently imposed. *Id.* Therefore, the hearsay issue was not before us in that appeal.

{¶ 28} In *State v. Houston*, we cited *Columbus v. Lacy*, 46 Ohio App.3d 161, 546

N.E.2d 445 (10th Dist. 1988), and *State v. Alderman*, 70 Ohio App.3d 147, 590 N.E.2d 836 (6th Dist. 1990). In *Columbus v. Lacy*, it appears that the defendant had objected to the hearsay testimony, which had come in during the preceding probable-cause hearing. 46 Ohio App.3d 162. We cannot determine from the opinion in *State v. Alderman* whether the defendant in that case had objected to the hearsay testimony. That opinion does not discuss ineffective assistance of counsel, or plain error, so it seems likely that the error in that case was preserved.

{¶ 29} Finally, Pullen-Morrow cites *State v. Gray*, 12th Dist. Butler No. CA2008-12-294, 2009-Ohio-4821. In that case, the court held that trial counsel was ineffective for having failed to object, at the defendant's criminal jury trial, to testimony concerning out-of-court statements by the alleged victim. The issue arose in the context of an appeal from the denial of the defendant's motion for a new trial under Crim. R. 33. The court of appeals held that "due to [the defendant's] attorney's ineffectiveness, her trial was so demonstrably unfair that there is a reasonable probability the result would have been different absent her attorney's deficient performance." *Id.*, ¶ 31. The court of appeals cited *Williamson v. U.S.*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), in support of its holding. In *Williamson*, the trial court had made a specific ruling that the out-of-court statement in that case could be admitted in the defendant's criminal trial. *Id.*, 512 U.S. 597. Therefore, although the opinion of the United States Supreme Court does not expressly note that the defendant in that case had objected to the admission of the out-of-court statement, it appears likely that the defendant did so. In any event, it is questionable whether a defendant needs to interpose an express objection to the admission of testimony when the trial court

makes an express ruling that the testimony is admissible proof of an out-of-court statement. The purpose for requiring an objection to preserve error is to ensure that the trial court has an opportunity to consider the issue presented; here, the United States District Court expressly considered the issue.

**{¶ 30}** We conclude that the holding in *State v. Gray* may be distinguishable because: (1) the issue of ineffective assistance arose in the context of a Crim.R. 33 motion for a new trial, in which the record could be made up on the issue of trial counsel's ineffectiveness; or (2) the failure to object occurred at a trial, not at a community control revocation hearing. To the extent that *State v. Gray* is not distinguishable, we do not find it persuasive.

**{¶ 31}** Pullen-Morrow's sole assignment of error is overruled.

### III. Conclusion

**{¶ 32}** Pullen-Morrow's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

CUNNINGHAM, J., concurs.

GRADY, P.J., dissenting:

**{¶ 33}** The report introduced through the testimony of Linda Toops, an employee of the Montgomery County Adult Probation Department, was prepared by Jennita Scott, an employee of the Mon Day Program. Toops had no personal knowledge of the matter the report contains. Scott did not appear at the revocation hearing, and there was no showing she

was unavailable to testify, or that there was good cause for denying Defendant her right to confront Scott concerning the contents of her report. In that circumstance, admission of the report and Toops' testimony concerning it denied Defendant her right of due process. *State v. Miller*, 42 Ohio St.3d 102, 326 N.E.2d 259 (1975). The failure of Defendant's counsel to object to Toops' hearsay testimony fell below an objective standard of representation. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 34} The further issue is whether Defendant was prejudiced by her counsel's deficient performance; that is, whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.

{¶ 35} Had counsel objected to Toops' testimony concerning Scott's report, the outcome of the proceeding on that day necessarily would have been different. It was counsel's duty to follow every available avenue to obtain that result. Even had the court continued the hearing to allow the State to call Scott, there is no basis to conclude that Scott's testimony would have been any more adverse to Defendant than her report was. It might even have been helpful, to the extent that confrontation sometimes produces such a result. Counsel's failure to object deprived Defendant of that opportunity.

{¶ 36} I would reverse and remand.

. . . . . . . . . . . .

(Hon. Penelope R. Cunningham, First District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).


Copies mailed to:

Mathias H. Heck

Johnna M. Shia
Michael C. Thompson
Hon. Mary K. Huffman